UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

WARREN A. CROCKETT,

      Plaintiff,                         Case No. 12-cv-13869
                                            Hon. Matthew F. Leitman

v.

FORD MOTOR COMPANY *et al.*,

      Defendants.

_____/

## <u>ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS'</u> <u>MOTIONS FOR SUMMARY JUDGMENT (ECF ## 70, 71)</u>

## <u>INTRODUCTION</u>

In this action, Plaintiff Warren A. Crockett ("Crockett"), an African-American male, claims that his former alleged employers, Defendants Ford Motor Company ("Ford") and CBRE, Inc. ("CBRE") (collectively, "Defendants"), violated his rights under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* ("Title VII"), 42 U.S.C. § 1981 *et seq.* ("Section 1981"), and Michigan's Elliot-Larsen Civil Rights Act, M.C.L. § 37.2101 *et seq.* (the "ELCRA"). More specifically, Crockett asserts that Defendants unlawfully (1) terminated his employment based upon his race; (2) committed other discrete acts of employment discrimination against him; (3) retaliated against him when he

1

complained about racial harassment; and (4) subjected him to a racially hostile work environment.

As explained in more detail below, Defendants are entitled to summary judgment on Crockett's claims based on his termination because there is no evidence that Crockett's race played any role in his discharge. Defendants are likewise entitled to summary judgment on Crockett's other discrimination and retaliation claims, and CBRE is entitled to summary judgment on Crockett's hostile-work-environment claim under Title VII.[1] However, Ford is not entitled to summary judgment on Crockett's Title VII hostile-work-environment claim, and neither Defendant is entitled to summary judgment on Crockett's hostile-work-environment claims under Section 1981 and the ELCRA.

## FACTUAL BACKGROUND

### A.   The Parties

In June 1996, Crockett began working as a millwright at Ford's Chesterfield Trim Plant in Chesterfield, Michigan. (*See* Crockett statement, #76-9 at 1, Pg. ID 875.) In 1998, Crockett transferred to Ford's Research and Engineering Center (the "R&E Center") in Dearborn, Michigan. (*See id.*) Crockett's responsibilities

---

[1] As also explained below, CBRE is entitled to summary judgment on Crockett's hostile-work-environment claim brought under Title VII for the sole reason that Crockett failed to exhaust his administrative remedies against CBRE.

included maintaining and repairing Ford's equipment. (*See* Crockett Deposition, ECF #76-5 at 66, Pg. ID 768.)

CBRE is a real estate services company that provides "facilities management services." (Declaration of CBRE Senior Manager Julie Smith, ECF #71-2 at 3, ¶¶ 5-6, Pg. ID 610.) One of CBRE's clients is Ford. (*See id.*) Among other things, CBRE manages many of Ford's facilities, including the R&E Center where Crockett worked. (*See id.* at 3, ¶6, Pg. ID 610.)

John Vavari ("Vavari") worked as one of CBRE's maintenance supervisors. (*See* Vavari Dep., ECF #76-3 at 11, Pg. ID 706.) Beginning in 2007, Vavari "manage[d] the day-to-day maintenance" of multiple Ford facilities. (*Id.* at 16-17, Pg. ID 707.) Vavari supervised more than twenty employees, including Crockett and other Ford employees who worked at the R&E Center. (*See id.* at 19, Pg. ID 707.)

## B.    Relevant Terms of Crockett's Employment

Crockett worked as an hourly employee and was a member of the United Auto Workers Union (the "UAW"). (*See* Declaration of Ford Human Resources Associate Shad Bean, ECF #70-2 at 3, ¶8, Pg. ID 420.) "As an hourly, UAW-represented employee, the terms and conditions of [] Crockett's employment with Ford were governed by a collective bargaining agreement ([the] "Ford-UAW CBA") between the UAW and Ford." (*Id.* at 3, ¶9, Pg. ID 420.)

3

The Ford-UAW CBA "sets forth a process for conducting [an] independent medical examination" ("IME") of an employee when there is a dispute over whether the employee suffers from a health condition that prevents him from working (the "IME Process"). (*Id.* at 4, ¶11, Pg. ID 421.) When Ford invokes the IME Process, the employee in question must attend a scheduled examination. (*See id.* at 4, ¶12, Pg. ID 421; *see also* IME Process description, ECF #70-2 at 27, Pg. ID 444.) "Following the IME, the IME doctor provides a report stating his or her conclusion regarding whether the employee is fit to return to work. The conclusion reached by the IME doctor is binding on Ford, the UAW, the employee, and the insurer." (Bean Decl., ECF #70-2 at 4, ¶13, Pg. ID 421.) Employees who are deemed fit to work at the conclusion of the IME Process are "expected to report to work as directed." (*Id.*)

If an employee is deemed fit to work but fails to appear for work, Ford is authorized under the Ford-UAW CBA to mail a notice to the employee "which requires the employee, within five working days after the notice is mailed, to report to work or provide medical documentation substantiating his or her need for continued leave." (*Id.* at 4-5, ¶¶ 14-15, Pg. ID 421-422.) This notice is known as a "Five-Day Quit Notice." (*Id.*) The Ford-UAW CBA authorizes Ford to fire any employee "who fail[s] to respond to a Five-Day Quit Notice by returning to work or providing additional documentation from their medical providers." (*Id.* at 5,

¶16, Pg. ID 422.)   Importantly, an employee who is deemed fit to work at the conclusion of the IME Process "may not rely upon the continuation of his or her pre-IME condition as a satisfactory reason for his or her absence in response to a Five-Day Quit Notice."   (*Id.* at 5, ¶17, Pg. ID 422) (internal quotation marks omitted.)   Such an employee must either return to work or provide documentation related to a different medical condition that was not part of the IME Process in order to remain on leave.   (*See id.*)

### C.   Crockett Files a Grievance Against Vavari But His Statement to Ford in Support of His Grievance Does Not Include a Complaint That Vavari Acted Against Him Based Upon His Race

In February 2011, Crockett filed a grievance against Vavari with the UAW. (*See* Second Amended Complaint, ECF #53 at ¶32.)   As part of the grievance process, Crockett provided a statement to Ford Human Resources representative Shad Bean ("Bean") on February 25, 2011 (the "February 2011 Grievance Statement").   (*See* ECF #70-2 at 33-34, Pg. ID 450-451.)   Crockett told Bean that he had "been having issues with John Vavari" for years.   (*Id.* at 33, Pg. ID 450.) Crockett explained that in 2009, Vavari did not allow Crockett to return to his original workspace after Crockett agreed to relocate temporarily to another building within the R&E Center.   (*See id.*)   Crockett also said that, among other things, Vavari refused to provide him with the tools Crockett needed to complete his work assignments and to allow him to take unpaid time off.   (*See id.*)   Crockett

concluded his statement to Bean by saying that most of his problems with Vavari arose after the lunch hour and that he just "would like to be left alone in peace after lunch." (*Id.* at 34, Pg. ID 451.)  The February 2011 Grievance Statement did not include any allegations by Crockett that Vavari was discriminating against him based on his race.  (*See id.*)

**D.     Crockett Stops Reporting to Work Because of a Medical Condition**

On March 2, 2011, Crockett reported to the R&E Center medical department, said he was not feeling well, and left work so he could visit his physician.  (*See* Bean Decl. at 9, ¶45, Pg. ID 426; *See also* Declaration of Ford Hourly Administrator Sharron Bryant, ECF #70-4 at 2, ¶8, Pg. ID 496.)  Between March 3, 2011, and March 9, 2011, Crockett did not report to work and "did not submit any medical documentation substantiating his absences during this time period." (Bryant Decl., ECF #70-4 at 3, ¶9, Pg. ID 497.)  As a result, on March 9, 2011, Ford sent Crockett a Five-Day Quit Notice.  (*See id.* at 3, ¶10, Pg. ID 497.)  Crockett responded to the notice by requesting an occupational leave of absence, which Ford granted.  (*See id.* at 3, ¶¶ 12-13, Pg. ID 497.)

**E.     While Out on Leave, Crockett Supplements His February 2011 Grievance Statement With a Claim That Vavari Acted Against Him Based on His Race**

On March 18, 2011, while out on leave, Crockett supplemented the February 2011 Grievance Statement (the "March 2011 Grievance Supplement").  (*See* ECF

6

#70-2 at 39, Pg. ID 456.)   In the March 2011 Grievance Supplement, Crockett

claimed that Vavari's conduct was motivated by race.   Specifically, Crockett said

that:

> On 2/25/11, I made a statement to Human Resources
> concerning the way I am mistreated by my supervisor,
> John Vavari.   I would like to add that I feel that this
> mistreatment is due to the fact that I am African
> American and Mr. Vavari discriminates against me due
> to this fact.   This harassment has been occurring at
> regular intervals since 2009, but increased after my
> statement to Human Resources on 2/25/11.

(*Id.*)

## F.      Ford Invokes the IME Process and Crockett is Deemed Fit to Work

In early April 2011, Ford invoked the IME Process with respect to Crockett

in order to determine whether Crockett was entitled to remain on leave.   (*See*

Bryant Decl., ECF #70-4 at 5, ¶20, Pg. ID 499.)   Dr. Beverly Blaney ("Dr.

Blaney") of Ford's Medical Department made the decision to require Crockett to

participate in the IME Process.   (*See id.*)   Like Crockett, Dr. Blaney is African

American.   (*See id.* at 5 ¶21, Pg. ID 499.)   There is no evidence in the record Dr.

Blaney knew that Crockett had filed a grievance against Vavari when she ordered

Crockett to participate in the IME Process.

Ford originally scheduled Crockett's IME for April 12, 2011, but Crockett

failed to appear for the examination.   (*See id.* at 5, ¶22, Pg. ID 499.)   Ford

subsequently rescheduled the IME for May 11, 2011. (*See id.*)   In the meantime,

7

Crockett continued to remain home from work on approved leave. (*See id.* at 5-6, ¶¶ 23-26, Pg. ID 499-500.)

Crockett appeared for and completed his rescheduled IME on May 11, 2011. (*See id.* at 6, ¶27, Pg. ID 500.) That same day, Crockett's "personal physician submitted documentation [to Ford] purporting to extend [] Crockett's leave of absence until June 10, 2011." (*Id.* at 6, ¶28, Pg. ID 500.) Ford "conditionally granted [the extended leave] pending Ford's receipt of the formal written IME results." (*Id.* at 6, ¶29, Pg. ID 500.)

Ford received the results of Crockett's IME on May 19, 2011. (*See id.* at 6, ¶30, Pg. ID 500.) "The IME concluded that [] Crockett was fit to return to work. As a result, [] Crockett's medical leave was closed as of May 19, 2011." (*Id.* at 6, ¶31, Pg. ID 500.) Ford thereafter contacted Crockett on May 19, informed him of the results of the IME, and instructed him to return to work. (*See id.* at 6, ¶32, Pg. ID 500.)

### E.   Crockett Does Not Return to Work and Ford Terminates His Employment

Crockett did not return to work as directed. (*See id.* at 6, ¶33, Pg. ID 500.) Instead, Crockett told Ford that his doctor had excused him from work and that he "wasn't able to return to work." (Crockett Deposition, ECF #76-5 at 51, Pg. ID 764.) Under the Ford-UAW CBA, however, the results of the IME Process are "final and binding" upon the employee. (IME Process description, ECF #70-2 at

27-28, Pg. ID 444-445.)  This means that an employee who has been cleared to return to work at the conclusion of an IME must resume performing his job – even if the employee's own physician disagrees with the conclusion of the IME.  (*See* Bean Decl., ECF #70-2 at 5, ¶17, Pg. ID 422.)

On May 24, 2011, Ford sent Crockett another Five-Day Quit Notice.[2]  (*See* Bryant Decl., ECF #70-4 at 7, ¶34, Pg. ID 501.)  Ford also sent a copy of the Five-Day Quit Notice to the UAW.  (*See id.*)

As of May 31, 2011, Crockett still had not reported to work, nor had he submitted to Ford any medical documentation that would have justified his continued absence. (*See id.* at 7, ¶37, Pg. ID 501.)  Ford then contacted Crockett's union representative "to notify him that [Crockett's] employment would be terminated [on] June 1, 2011, if [Crockett] failed to respond to the May 24, 2011, [Five-Day Quit Notice]." (*Id.* at 7, ¶38, Pg. ID 501.)

Crockett did not report to work on June 1. (*See id.* at 8, ¶41, Pg. ID 502.) Ford again reached out to the UAW concerning its intent to discharge Crockett. (*See id.* at 8, ¶39, Pg. ID 502.)  Ford says that based on its conversations with the UAW, it was Ford's "understanding…that [] Crockett was aware that he was

---

[2] Crockett now claims he never received the notice. (*See* Crockett Dep., ECF #76-5 at 53, Pg. ID 765.)  However, he acknowledges that he spoke with Dr. Blaney on May 19 or May 20, 2011, that Dr. Blaney gave provided him the results of the IME Process and said he "need[ed] to return to work," and that he told Dr. Blaney he would not be returning to work.  (*See* Crockett Dep., ECF #76-5 at 49-52, Pg. ID 764.)

expected to report to work or otherwise contact Ford regarding his status and understood that if he failed to do so…his employment would be terminated." (*Id.* at 7, ¶40, Pg. ID 502.)  Ford did not receive a response from the UAW nor from Crockett, and on June 2, 2011, Ford terminated Crockett's employment effective June 1, 2011. (*See id*. at 8, ¶¶ 41-42, Pg. ID 502.)

## PROCEDURAL HISTORY

Crockett initially filed this action *pro se* on August 31, 2012.  (*See* ECF #1.) He filed a First Amended Complaint on April 2, 2013.  (*See* ECF #22.)  Crockett then filed a motion to appoint counsel. (*See* ECF #35.)   The Court granted Crockett's motion and appointed well-respected attorneys Daniel Swanson and Tad Roumayah of the Sommers Schwartz law firm to represent Crockett.  (*See* ECF ## 37-39.)

Following the appointment of counsel, Crockett filed a Second Amended Complaint.  (*See* ECF #53.)  In the Second Amended Complaint – which remains the operative Complaint in the action – Crockett says that Defendants terminated his employment and discriminated against him in other ways in violation of Title VII, Section 1981, and the ELCRA.  (*See, e.g., id.* at ¶¶ 51.)  Crockett also asserts retaliation and hostile-work-environment claims under those statutes.  (*See id.* at ¶¶ 51d-e.)  The specific details of Crockett's allegations are set forth below.

On February 19, 2015, Crockett's appointed attorneys filed a motion to withdraw as counsel due to "a complete breakdown of the Attorney-Client relationship."  (ECF #61 at ¶1, Pg. ID 360.)  The Court granted the motion (*see* ECF #62), and Crockett asked the Court to appoint new counsel.  (*See* ECF #64.) Over the objections of Defendants (*see* ECF #65), the Court appointed new counsel – Ms. Marla Linderman of Atnip & Associates, PLLC – on April 9, 2015.  (*See* ECF #67.)  Ms. Linderman worked diligently on Crockett's behalf, and the Court thanks her for her hard work in this action.

After the close of discovery, the Defendants each filed a motion seeking summary judgment (the "Motions").  (*See* ECF ## 70, 71.)  After granting Crockett multiple extensions to respond to the Motions (*see* ECF ## 73, 75) and carefully reviewing his response (*see* ECF #76), the Court held oral argument on September 17, 2015.

## GOVERNING LEGAL STANDARD

A movant is entitled to summary judgment when it "shows that there is no genuine dispute as to any material fact...."  *U.S. SEC v. Sierra Brokerage Servs., Inc.*, 712 F.3d 321, 326–27 (6th Cir. 2013) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986)) (quotations omitted).  When reviewing the record, "the court must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor."  *Id.*  "The mere existence of

11

a scintilla of evidence in support of the [non-moving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for [that party]." *Anderson*, 477 U.S. at 252. Summary judgment is not appropriate when "the evidence presents a sufficient disagreement to require submission to a jury." *Id.* at 251-252. Indeed, "[c]redibility determinations, the weighing of the evidence, and the drafting of legitimate inferences from the facts are jury functions, not those of a judge…" *Id.* at 255.

## ANALYSIS

Crockett's claims against the Defendants can be broken up into three distinct categories: (1) the claims alleging that Defendants discriminated against Crockett based upon his race when they terminated his employment and took other adverse actions against him, (2) the claims alleging that Defendants unlawfully retaliated against Crockett for complaints about alleged racial harassment, and (3) the claims that Crockett was subjected to a racially hostile work environment. The Court will separately address each category.

## A.   Crockett's Termination and Other Discrete Acts of Racial Discrimination

### 1.   The Applicable Legal Framework

Crockett claims that Defendants unlawfully terminated his employment and otherwise discriminated against him due to his race in violation of Title VII, Section 1981, and the ELCRA. In support of these claims, Crockett must "present

direct evidence of discrimination or introduce circumstantial evidence that would allow an inference of discrimination." *Johnson v. Kroger Co.*, 319 F.3d 858, 865 (6th Cir. 2003).

Crockett has not presented any direct evidence of racial discrimination with respect to his termination or the other acts he complains about. Instead, he relies upon circumstantial evidence. The Court evaluates that evidence under the framework established in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 801–805 (1973). Under this framework, Crockett

> first carries the burden of establishing a *prima facie* case.
> To establish a *prima facie* case of discrimination under
> both Title VII and the [ELCRA], [Crockett] must show
> that 1) he is a member of a protected class; 2) he was
> qualified for the job and performed it satisfactorily; 3)
> despite his qualifications and performance, he suffered an
> adverse employment action; and 4) he was replaced by a
> person outside the protected class or was treated less
> favorably than a similarly situated individual outside of
> his protected class.[3]

*Laster v. City of Kalamazoo*, 746 F.3d 714, 727 (6th Cir. 2014) (internal citation omitted).

---

[3] Crockett's discrimination claims under Section 1981 are examined under the same framework. *See, e.g., Noble v. Brinker Int'l., Inc.*, 391 F.3d 715, 720 (6th Cir. 2004) ("The elements of [a] *prima facie* case as well as the allocations of the burden of proof are the same for employment claims stemming from Title VII and § 1981").

If Crockett establishes a *prima facie* case of discrimination, "the burden of production of evidence shifts to [the Defendants] to articulate some legitimate, nondiscriminatory reason for [the adverse employment action]." *Kuhn v. Washtenaw County*, 709 F.3d 612, 624 (6th Cir. 2013). If Defendants articulate such a reason, "[t]he burden then shifts back to [Crockett] to demonstrate that the proffered reason was not the true reason for the employment decision, but was instead a pretext designed to mask unlawful discrimination." *Id.* (internal citation and punctuation omitted).

## 2. Crockett Has Failed to Establish a *Prima Facie* Case of Racial Discrimination With Respect to His Termination

Crockett has failed to establish a *prima facie* case of racial discrimination with respect to his termination because he has not presented any evidence that he was "treated less favorably than a similarly situated individual outside of his protected class." *Laster*, 746 F.3d at 727. More specifically, Crockett has not identified any employee outside of his protected class who remained employed after he (1) participated in the IME Process and was cleared to work, (2) received a Five-Day Quit Notice, and (3) failed to return to work as directed.[4] Crockett's

---

[4] Crockett suggests that the plaintiff in *La Fawn Carter v. Ford Motor Company*, 06-15285, 2007 WL 4326944 (E.D. Mich. Dec. 10, 2007), received a Five-Day Quit Notice, failed to return to work, was fired by Ford, and was then reinstated. (Crockett Brief, ECF #76 at 37-38, Pg. ID 697-698.) But Crockett has not cited any evidence as to Ms. Carter's race, and the decision in her case does not mention her race. Moreover, Ms. Carter was reinstated after her union filed a grievance on

failure to identify such a similarly-situated employee is fatal to his claim that his firing was the result of unlawful racial discrimination. *See, e.g., Younis v. Pinnacle Airlines, Inc.*, 610 F.3d 359, 363-364 (6th Cir. 2010) (holding that plaintiff had not established *prima facie* case of employment discrimination where plaintiff failed to identify a similarly-situated employee who received more favorable treatment).

Moreover, there is simply no evidence in the record that Crockett's race played any role in his termination. Crockett has not identified any evidence that even remotely suggests that any of the employees who were involved in the IME Process and in his termination acted with any racial animus. And it is undisputed that Vavari – the primary bad actor according to Crockett – had no authority to fire Crockett and played no role in the IME Process and the termination decision. (*See* Vavari Dep., ECF #76-3 at 49-50, Pg. ID 715-716; *see also generally Bryant Decl.*, ECF #70-4). Because Crockett has not produced any evidence that could circumstantially support an inference that his firing was tainted by racial discrimination in any way, Defendants are entitled to summary judgment on his claims based upon his termination.

---

her behalf, *see Carter*, 2007 WL 4326944, at * 2 – which the UAW did not do on Crockett's behalf here. Furthermore, there is no indication in the *Carter* decision that Ms. Carter was cleared for work by an IME. Finally, Ms. Carter was initially terminated in 2006 – more than six years before Ford fired Crockett – and Crockett has not established that Carter was subject to the same union contract that provided the framework for Crockett's IME Process and termination. For all of these reasons, Crockett has failed to establish that Ms. Carter was a similarly-situated person outside of his protected class who was treated more favorably than him.

15

### 3.   Crockett Cannot Save His Termination Claims by Invoking the Family and Medical Leave Act

In an attempt to save his claims based upon his termination, Crockett argues that Defendants fired him in violation of the Family and Medical Leave Act, 29 U.S.C. § 2601 *et seq.* (the "FMLA") (Crocket Br., ECF #76 at 31-37, Pg. ID 691-697.)  Crockett candidly acknowledges that his Second Amended Complaint does not contain a claim that Defendants violated the FMLA.  He nonetheless insists that Defendants' alleged FMLA violation precludes the Court from granting summary judgment in favor of Defendants on his termination claims.  Crockett argues that since Defendants fired him in violation of the FMLA, Defendants cannot carry their burden of demonstrating a "legitimate" basis for his termination. But because Crockett failed to establish his *prima facie* case of unlawful discrimination, the burden never shifted to Defendants to demonstrate a legitimate basis for Crockett's discharge. *See, e.g., Tilley v. Kalamazoo County Road Commission*, 777 F.3d 303, 309 n.3 (2015) (concluding that because plaintiff had failed to establish his *prima facie* case, court need not continue with the *McDonnell Douglas* analysis to determine if proffered reason for termination was pretextual).  Moreover, even if Defendants did terminate Crockett in violation of the FMLA, that would in no way support Crockett's claims of *racial* discrimination.  For these reasons, Defendants' alleged FMLA violation cannot

save Crockett's claims that Defendants unlawfully terminated him based upon his race.[5]

> **4.    Crockett Has Failed to Establish a *Prima Facie* Case With Respect to His Other Alleged Discrete Acts of Racial Discrimination**

In addition to claiming that Defendants fired him based upon his race, Crockett alleges that Defendants subjected him to other discrete acts of racial discrimination:

> It is also clear that [Crockett] was subjected to multiple adverse employment actions, including the denials of promotions, different job conditions as to attendance, scrutiny including his car and computer being searched, job placement and creating unsafe working conditions, as well as termination.  Moreover, [Crockett] provided evidence, viewed in the totality of the circumstances, that other similarly situated employees, with the same position and supervisors, were treated more favorably on a daily basis.

(Crockett Br., ECF #76 at 25, Pg. ID 685.)

But Crockett cannot establish a *prima facie* case of racial discrimination by aggregating these allegedly-discriminatory acts and then broadly asserting that he was treated differently than those outside of his protected class.  On the contrary, "[e]ach incident of discrimination…constitutes a *separate* actionable unlawful

---

[5] In his response to the Motions, Crockett sought leave to amend his Complaint yet again to add an FMLA claim.  (*See* Crockett Br., ECF #76 at 36, Pg. ID 696)  The Court declines to permit that amendment at this late stage in the process – long after discovery has closed and Defendants have filed motions for summary judgment.  Such a late amendment would unfairly prejudice the Defendants.

employment practice." *National R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 114 (2002) (internal quotation marks omitted) (emphasis added). Thus, with respect to each claimed instance of employment discrimination, Crockett must separately establish a *prima facie* case – which includes showing that each allegedly-discriminatory act constituted (1) an "adverse employment action" and (2) that with respect to that particular action he "was treated less favorably than a similarly situated individual outside of his protected class." *Laster*, 746 F.3d at 727. He has not done so.[6]

Several of the incidents included in Crockett's list of discriminatory acts do not rise to the level of an "adverse employment action" – one that is "a *materially adverse change* in the terms or conditions of employment" and "*constitutes a significant change in employment status*, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Id.* (internal quotation marks omitted; emphasis

---

[6] Crockett argues that when the Court analyzes his racial discrimination claim, it should consider the "totality" of these discrete allegedly-discriminatory actions and the "totality" of the evidence he has presented. (Crockett's Br., ECF # 76 at Pg. ID 685.) But the case Crockett cites for this proposition dealt with a hostile-work-environment claim, not a claim analyzing discrete acts of alleged racial discrimination. *See Jackson v. Quanex*, 191 F.3d 647, 659 (6th Cir. 1999). Claims alleging "discrete discriminatory acts" are analyzed differently from those in which a plaintiff asserts a "hostile work environment." *See, e.g., Hunter v. Secretary of U.S. Army*, 565 F.3d 986, 993 (6th Cir. 2009). The Court has considered the totality of the alleged harassment in the context of Crockett's hostile-work-environment claim. *See infra* at pp. 28-34.

added).[7]   For instance, Crockett claims Ford security personnel searched his car a single time.  (*See* Crockett Dep., ECF #76-5 at 42-47, Pg. ID 762-763.)  But that one search did not amount to a material adverse change in the terms or conditions of his employment.  Crockett also says that his computer access was suspended for two weeks in 2009.  (*See id.* at 127-130, Pg. ID 783-784.)  But Crockett has not established that he needed the computer to perform his tasks as a millwright nor that the suspension significantly changed his employment status.  *See, e.g., Michael*, 496 F.3d at 594 (requiring employee to turn in laptop computer does not satisfy adverse employment action requirement of *prima facie* case).  Crockett further claims that Vavari confronted him at work while Vavari was wearing a bulletproof vest (*see* Crockett Dep., ECF #76-5 at 182-183, Pg. ID 797), but a single confrontation does not constitute an adverse employment action.  *See Michael*, 496 F.3d at 594.

With respect to other alleged acts of discrimination, Crockett has not identified any similarly-situated employees outside of his protected class who were treated differently than him.  For example, Crockett complains that he was not

---

[7] *See also Michael v. Caterpillar Fin. Servs. Corp.*, 496 F.3d 584, 594 (6th Cir. 2007) ("[A] materially adverse change in the terms and conditions of employment must be more disruptive than a mere inconvenience or an alteration of job responsibilities. A materially adverse change might be indicated by a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation").

permitted to return to a job site in a particular building after working for a period in a neighboring building (*see id.* at 97-98, Pg. ID 776), but he presents no evidence that a similarly-situated white employee was allowed to rotate back after accepting an assignment in a different building.  Crockett also claims that he was denied the ability to work overtime while white employees were permitted to do so.  (*See id.* at 89-93, Pg. ID 774.)  Crockett identified two occasions on which this happened. (*See id.*)  With the first, Crockett conceded that he was "guessing" that similarly-situated white employees actually worked the overtime in question, and he admitted that his guess was based upon hearsay.  (*See id.* at 90, Pg. ID 774.)  As to the second project, Crockett did identify a white employee who was allowed to work overtime, Mark Twombly ("Twombly") (*see id.* at 92, Pg. ID 774), but Crockett has not affirmatively shown that he and Twombly are similarly-situated "in all relevant respects."  *Martinez v. Cracker Barrel Old Country Store, Inc.*, 703 F.3d 911, 916-917 (6th Cir. 2013).  Finally, Crockett complains that he was denied the opportunity to apply for a promotion when Vavari failed to post in Crockett's building a notice for an open position.  (*See id.* at 113-116, Pg. ID 780.)  But Vavari's alleged failure to post the open position impacted *all* of the employees in that building in the *same* manner; Crockett has not presented evidence that the

purported non-posting affected him differently than any similarly-situated employees outside of his protected class who worked in the same building.[8]

In sum, the Court has reviewed each of Crockett's allegations of employment discrimination and has determined that Crockett has not established a *prima facie* case on any of them. Defendants are therefore entitled to summary judgment on Crockett's race discrimination claim.

**B.   Crockett's Retaliation Claims**

**1.      The Applicable Legal Framework**

Crockett next asserts claims for retaliation. In order to establish a *prima facie* case of retaliation under Title VII and the ELCRA, Crockett must show that "(1) he engaged in protected activity, (2) the [Defendants] knew that [Crockett] had exercised his civil rights, (3) [Defendants] took an adverse employment action against [Crockett], and (4) there was a causal connection between [Crockett's] protected activity and the adverse employment action." *Kuhn*, 709 F.3d at 627-

---

[8] Crockett also complains he was prevented from applying for a promotion because he was marked tardy when he admittedly arrived late for a weekend shift. (*See* Crockett Dep., ECF #76-5 at 114-115, Pg. ID 780.) While Crockett alleges that Vavari did not mark white employees tardy when they arrived late, Vavari was *not* the supervisor who gave Crockett the weekend tardy marking that allegedly blocked him from applying for the promotion. (*See id.*) There is no evidence that the supervisor who gave Crockett the weekend tardy treated Crockett differently than any white employees similarly-situated to Crockett with respect to attendance and/or late arrival issues. Thus, Crockett has failed to show that the weekend tardy that allegedly blocked him from applying for a promotion was connected to his race.

628[9]. In addition, Crockett must show that his protected activity was the "but for" cause of the adverse employment actions taken against him. *Univ. of Tex. Sw. Med. Ctr. v. Nassar,* 133 S. Ct. 2517, 2533 (2013). "But for" causation exists where "the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer." *Id.*

### 2.   Crockett Has Failed to Establish a *Prima Facie* Case With Respect to His Retaliation Claims

Crockett asserts that he was unlawfully retaliated against in at least three respects. First, Crockett says that Vavari retaliated against him because he complained about Vavari's conduct in the February 2011 Grievance Statement. Second, Crockett asserts that various other employees of Defendants retaliated against him when he complained about Vavari. Finally, Crockett claims that his firing was, at least in part, retaliation for his complaints about Vavari. For the reasons explained below, Crockett has failed to establish a *prima face* case with respect to any of these claims of retaliation.

### a.   Vavari's Alleged Retaliation

Crockett insists that Vavari retaliated against him because Crockett made allegations against Vavari in the February 2011 Grievance Statement. (*See, e.g.,*

---

[9] Crockett's retaliation claim under Section 1981 is reviewed under the same standard. *See Wade v. Knoxville Utilities Bd.*, 259 F.3d 452, 464 (6th Cir. 2001) (retaliation claims under Section 1981 "are governed by the same burden-shifting standards as the claims under Title VII").

Crockett Dep., ECF #76-5 at 70-71, Pg. ID 769.)  But in that statement Crockett did not complain that Vavari had acted against him because of his race.  On the contrary, Crockett primarily complained that Vavari treated him poorly after Vavari returned from lunch each day, and Crockett cited a number of examples of Vavari's alleged mistreatment of him that, on their face, had nothing to do with race.  (*See* February 2011 Grievance Statement, ECF #70-2 at 33-34, Pg. ID 450-451.)  Thus, the February 2011 Grievance Statement did not constitute, nor reflect that Crockett had engaged in, "protected activity."  Accordingly, even if Vavari retaliated against Crockett for making allegations against him in the February 2011 Grievance Statement, that retaliation would not be actionable under Title VII, the ELCRA, or Section 1981 because there is no evidence that Vavari retaliated against Crockett for making complaints about *race-based* discriminatory treatment.[10]  Moreover, Vavari specifically denied that he knew Crockett had made any race-based allegations or complaints against him (*see* Vavari Dep., ECF #76-3 at 74-77, Pg. ID 722), and Crockett has not identified any evidence in the record to dispute that testimony.  Under these circumstances, Crockett's retaliation claims fail as a matter of law.

_____

[10] Crockett testified that at the same time he provided Bean with the February 2011 Grievance Statement, he told Bean that Vavari was "harassing [him] because [he is] African American."  (Crockett Dep., ECF #76-5 at 121, Pg. ID 782.)  But the February 2011 Grievance Statement that Crockett signed does not mention race, and there is no evidence that Vavari knew that Crockett said anything to Bean about racial harassment.

Crockett counters that even if he did not mention race in the February 2011 Grievance Statement, he did expressly mention racial issues in the March 2011 Grievance Supplement. (*See* ECF #70-2 at 39, Pg. ID 456.) But Crockett's statements in the March 2011 Grievance Supplement cannot form the basis of his retaliation claims. Crockett submitted the March 2011 Grievance Supplement while he was off work on leave (*see id.*), and he *never* returned from that leave (indeed, he was fired for refusing to return to work when ordered to do so). Thus, Vavari could not have, and did not, retaliate against Crockett in the workplace based upon Crockett's submission of the March 2011 Grievance Supplement because Crockett never appeared back at work after he submitted that document.

### b.      The Failure to Investigate Crockett's Claims Against Vavari

Crockett also claims that other employees of Defendants (aside from Vavari) retaliated against him for complaining that Vavari was discriminating against him. Crockett has not identified any affirmative actions that any other employees took against him in response to his complaints about Vavari. Instead, as Crockett's counsel explained during the hearing on the Motions, Crockett contends that these employees retaliated against him when they failed to investigate the complaints against Vavari that he brought to their attention.

Crockett has not cited any case in which a court has held that such a failure to investigate can constitute an "adverse action" in the context of a retaliation claim.  But even if a failure to investigate could amount to an adverse action, Crockett's retaliation claims related to the non-Vavari employees would still fail because the undisputed evidence establishes that they *did* investigate *and* act when Crockett raised concerns about Vavari's discriminatory conduct.

For example, Crockett says that he complained to Paul Vergari ("Vergari"), Larry Johnson ("Johnson") (Vavari's boss), Gina Waggoner ("Waggoner"), Doug Helland ("Helland"), and Rick Roman that (1) Vavari was not providing him the tools Crockett needed to complete his work and (2) Vavari was providing white employees with the tools they needed.  (*See* Crockett Dep., ECF #76-5 at 172-174, Pg. ID 794-795.)  But Crockett admits that these people *agreed* to speak to Vavari about Crockett's complaints, and, more importantly, that after he complained to these people, the necessary tools generally "*would*" be purchased for him. (*Id.* at 173-174, Pg. ID 795) (emphasis added.)  Crockett's own testimony thus belies his argument that employees of Defendants ignored his complaint that Vavari deprived him of the tools he needed.

Crockett also testified that he complained to Waggoner that Vavari was "harassing" him by refusing to allow him to return to his work station after he had spent time working at another station. (*See id.* at 175, Pg. ID 795.)  But Crockett

25

admitted that Waggoner "made [Vavari] move me back to my building…." (*Id.*) This admission by Crockett further undercuts his claim that employees of Defendants failed to investigate or respond to his protected complaints.

Indeed, Crockett candidly acknowledged that after he raised complaints about Vavari to other employees of Defendants, "the harassment would always either cease or go down to a minimum" before starting up again months later. (*Id.* at 176, Pg. ID 795.)  That is flatly inconsistent with Crockett's argument that employees of Defendants disregarded his complaints about Vavari.

For these reasons, Defendants are entitled to summary judgment on Crockett's claims that their employees retaliated against him by ignoring his complaints that constituted protected activity.[11]

### c.    Crockett's Termination

Finally, to the extent that Crockett asserts that Defendants unlawfully fired him, at least in part, in retaliation for his prior complaints about Vavari and his

---

[11] Crockett has identified other complaints that he lodged concerning Vavari's conduct, but they do not amount to protected activity because they did not reference any racial discrimination or harassment of any kind.  For instance, Crockett says that he complained to Helland and Waggoner that Vavari refused to allow him to use unpaid time off to attend a conference in 2011. (*See* Crockett Dep., ECF #76-5 at 171-172, Pg. ID 794; *see also id.* at 103-110, Pg. ID 777-779.) But there is no evidence that Crockett told Helland and Waggoner (or implied) that Vavari's refusal to allow him to attend the conference had any connection to his race.

working conditions, such claims fail for two reasons. First, Crockett has failed to provide any evidence that the employees who were involved in the decision to fire him had any knowledge of his protected activity. Ford Hourly Administrator Sharron Bryant ("Bryant") administered Crockett's termination, and when she did so, she "had no knowledge that [Crockett] had submitted a written complaint or grievance relating to any alleged discriminatory treatment by John Vavari." (Bryant Decl., ECF #70-4 at 8, ¶44, Pg. ID 902.) Crockett has not brought forward any evidence to dispute Bryant's account or to establish that any other employee who was involved in the decision to terminate his employment knew that he had engaged in a protected activity. Thus, his retaliation claim based on his termination fails. *See, e.g., Fenton v. HiSAN, Inc.*, 174 F.3d 827, 832 (6th Cir. 1999) (employee must show that his "protected activity was known to those who made th[e] decision" to retaliate); *see also Mullhall v. Ashcroft*, 287 F.3d 543, 554 (6th Cir. 2002).

Second, Crockett has also failed to present any evidence that his complaints about Vavari and/or his working conditions were the "but for" cause of his firing. Crockett concedes that he was fired for refusing to return to work at the completion of the IME Process. (*See* Crockett Dep., ECF #76-5 at 48, Pg. ID 763.) And Crockett has not identified any evidence in the record to support an allegation that the IME Process was in any way influenced or compromised by any alleged

27

"protected activity."  For this additional reason, Crockett has failed to establish a *prima facie* case of unlawful retaliation.

**C.      Crockett's Claims of a Hostile Work Environment**

      **1.      The Applicable Legal Framework**

To succeed on his claims of racially hostile work environment, Crockett "must demonstrate that: (1) [he] belonged to a protected group, (2), [he] was subject to unwelcome harassment, (3) the harassment was based on race, (4) the harassment was sufficiently severe or pervasive to alter the conditions of employment and create an abusive working environment, and (5) [Defendants] knew or should have known about the harassment and failed to act."  *Williams v. CSX Trans. Co.*, 643 F.3d 502, 511 (6th Cir. 2011).[12]

With respect to the third element, "[a] plaintiff can show that harassment was based on race by either putting forth 'direct evidence of the use of race-specific and derogatory terms,' or by showing that the harassing party treated employees not in the plaintiff's protected class differently—that is to say, better."

---

[12] The court in *Williams* applied this framework in the context of a hostile-work-environment claim brought pursuant to Section 1981, and the court noted that the standard is the same as the one used "for claims brought under Title VII." *Williams*, 643 F.3d at 511 n.4.  Likewise, the same standard is applicable to Crockett's hostile-work-environment claim brought pursuant to the ELCRA.  *See, e.g., Wasek v. Arrow Energy Services, Inc.*, 682 F.3d 463, 468 (6th Cir. 2012) ("The ELCRA hostile work environment analysis is identical to Title VII's analysis").

28

*Reed v. Proctor & Gamble Mfg. Co.*, 556 Fed. App'x 421, 432 (6th Cir. 2014) (quoting *Williams*, 643 F.3d at 511).

As to the fourth element, Crockett must show "both that the harassing behavior was severe or pervasive enough to create an environment that a reasonable person would find objectively hostile or abusive, and that he or she subjectively regarded the environment as abusive." *Hawkins, v. Anheuser-Busch, Inc.*, 517 F.3d 321, 333 (6th Cir. 2008) (internal quotation marks omitted). "To determine whether a work environment is hostile or abusive, courts look at the totality of the circumstances." *Id.* Thus, the Court must examine the "combined effect of all alleged acts of harassment." *Reed*, 556 Fed. App'x at 432. Factors the Court must consider include

> the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance. Conduct must be extreme to amount to a change in the terms and conditions of employment. Simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment.

*Barrett v. Whirlpool Corp.*, 556 F.3d 502, 515 (6th Cir. 2009) (internal citations and punctuation omitted).

29

"Summary judgment [on a hostile-work-environment claim] is appropriate only if the evidence is so one-sided that there is no genuine issue of material fact as to whether there was a hostile working environment."  *Hawkins*, 517 F.3d at 333. Indeed, "[w]hether harassing conduct is sufficiently severe or pervasive to establish a hostile work environment is quintessentially a question of fact."  *Id.* (internal quotation marks omitted).

### 2. A Genuine Issue of Material Fact Exists as to Whether Crockett Was Subjected to a Hostile Work Environment

Defendants argue that they are entitled to summary judgment on Crockett's hostile-work-environment claims because Crockett cannot establish that he was subjected to harassment that "was both based on his race and sufficiently severe or pervasive to alter the conditions of [his] employment and create an abusive working environment."   (Ford Br., ECF #70 at 19, Pg. ID 409) (internal punctuation omitted).  The Court disagrees.

Crockett has presented evidence that, when considered in its entirety and construed in Crockett's favor, could support findings that (1) Vavari repeatedly and openly treated Crockett worse than Crockett's white counterparts and (2) that this pattern of treatment created a racially-hostile environment that unreasonably interfered with, and altered, the terms of Crockett's employment.  For instance, Crockett has presented proof that:

30

- For a six-month period in 2010, Vavari "force[d] [Crockett] to come in the morning at 6:30 [and] be at his office" to check in before Vavari began his daily rounds.[13] (Crockett Dep., ECF #76-5 at 85-86, Pg. ID 773.) Crockett presented evidence that "no white employees" were subject to this same check-in requirement. (*Id.* at 63, Pg. ID 767.)

- Vavari docked Crockett's pay whenever he arrived late but regularly allowed white employees to arrive late without docking their pay. (*See id.* at 73-79, 81-82, Pg. ID 770-772.)

- Vavari refused to allow Crockett to leave early using unpaid time off but regularly allowed white employees to do so. (*See id.* at 134-135, Pg. ID 785.)

- While wearing a bulletproof vest, Vavari "got right in [Crockett's] face and tried to get [Crockett] to fight him." (*Id.* at 182-183, Pg. ID 797.) There is no evidence of any similar confrontations between Vavari and any white employees.

- Vavari repeatedly refused to provide Crockett with the tools necessary to complete his work – sometimes requiring Crockett to purchase tools with his own money – but Vavari regularly provided white employees with the tools they needed to perform their tasks. (*See id.* at 82-84, Pg. ID 772.)

---

[13] Vavari testified that he required Crockett to check in with him for less than two weeks. (Vavari Dep., ECF #76-3 at 112, Pg. ID 731.) Crockett's testimony on the length of the "check in" period was not crystal clear. (*See* Crockett Dep., ECF #76-5 at 86, Pg. ID 773.) But, Crockett answered in the affirmative when he was asked to confirm the following: "[t]hat's when you had to check in with [Vavari] *for six months*." (*Id.;* emphasis added.) For the purposes of the Motions, the Court must read Crockett's testimony in the light most favorable to Crockett – i.e., as stating that the check-in period lasted for six months.

- On "several" occasions, Vavari assigned Crockett alone to complete a job that required two employees and/or re-assigned Crockett's partner midway through a job that required two employees. Vavari did not do the same to white employees. (*See id.* at 61-62, 117-120, Pg. ID 767, 781.)

When considered in its totality and in Crockett's favor, this evidence creates a material factual dispute as to whether Vavari subjected Crockett to a racially hostile work environment.[14]

Defendants respond that even if Vavari subjected Crockett to a racially hostile work environment – a contention they vigorously dispute – they are not liable for Vavari's misconduct. Defendants focus on Vavari's status in relation to Crockett. They insist that, as a matter of law, Vavari was Crockett's co-worker, not his supervisor. This distinction is important because "an employer's liability for such harassment may depend on the status of the harasser. If the harassing employee is the victim's co-worker, the employer is liable only if it was negligent in controlling working conditions." *Vance v. Ball State University*, __ U.S. __, 133 S. Ct. 2434, 2441 (2013). Defendants contend that Crockett has not produced any

---

[14] When pressed at his deposition, Crockett was occasionally unable recall specifics about his mistreatment and/or the white employees who were treated better than him. However, Crockett's failure to provide these specifics is not necessarily fatal to his hostile-work-environment claims. Where a plaintiff presents evidence of "ongoing harassment" – as Crockett has here – "the 'inability to recount any more specific instances goes to the weight of [his] testimony, a matter for the finder of facts.'" *Hawkins,* 517 F.3d at 334.

evidence that they negligently failed to control his working conditions vis-à-vis Vavari and that they are thus entitled to summary judgment on his hostile-work-environment claim.

This argument fails because the Court cannot conclude as a matter of law that Vavari was Crockett's co-worker. The Supreme Court has explained that that a co-worker "cannot dock another's pay." *Burlington Ind. v. Ellerth*, 524 U.S. 742, 762 (1998); *see also Vance*, 133 S. Ct. at 2448. Here, Vavari admitted that he had the authority to dock Crockett's pay and that he actually exercised that authority against Crockett.[15] (*See* Vavari Dep., ECF #76-3 at 58, 60, 109-110, Pg. ID 718, 730-731.) Thus, Defendants have failed to establish *as a matter of law* that Vavari was merely Crockett's co-worker and that their claimed lack of negligence is a viable defense.

CBRE also argues that it cannot be held liable for Vavari's alleged harassing behavior because, as a matter of law, it did not employ Crockett – Ford did. (*See* CBRE Br., ECF #71 at 7-10, Pg. ID 599-602.) Crockett responds that CBRE and Ford were his "joint" employers. Entities are joint employers if they "share or co-determine those matters governing essential terms and conditions of employment."

---

[15] There is evidence in the record that Vavari's docking of Crockett's pay was more than a ministerial act. Indeed, Vavari confirmed that he had *discretion* about whether to dock an employee's pay, and that he was, in most instances, "lenient" when exercising that discretion. (*See* Vavari Dep., ECF #76-3 at 59, 110, Pg. ID 718, 731.)

*Painting Co. v. NLRB*, 298 F.3d 492, 500 (6th Cir. 2002). In order to determine whether CBRE was Crockett's joint employer, this Court must assess CBRE's "ability to hire, fire or discipline [Crockett], affect [Crockett's] compensation and benefits, and direct and supervise [Crockett's] performance." *EEOC v. Skanska USA Bldg., Inc.*, 550 Fed. App'x 253, 256 (6th Cir. 2013) (citing *Carrier Corp. v. NLRB,* 768 F.2d 778, 781 (6th Cir. 1985)).

While Vavari did not have the authority to hire or fire Crockett, Vavari testified that he had the authority to (1) send Crockett home as a form of discipline; (2) dock Crockett's pay if Crockett came in late or left early; (3) approve or disapprove Crockett's requests for paid time off; (4) assign work projects to Crockett on a day-to-day basis; (5) direct Crockett to work with particular employees; and (6) transfer Crockett within buildings at the R&E Center and require him to relocate to another location within the facility. (*See id.* at 58, 60, 63-66, 109-110, Pg. ID 718-720, 730-731.) As described above, Vavari also had the authority to require Crockett to "check in" with him each morning before the start of Crockett's shift. (*See id.* at 110-112, Pg. ID 731.) In light of this testimony, CBRE has failed to establish *as a matter of law* that it was not a joint-employer of Crockett. CBRE is therefore not entitled to summary judgment on this basis.[16]

---

[16] CBRE is entitled to summary judgment on Crockett's hostile-work-environment claim under Title VII. Title VII requires a plaintiff to exhaust his administrative remedies before seeking judicial relief. *See, e.g., Davis v. Sodexho*, 157 F.3d 460,

## CONCLUSION

For the reasons stated above, **IT IS HEREBY ORDERED** that Defendants'
Motions for Summary Judgment (ECF ## 71, 72) are **GRANTED IN PART AND
DENIED IN PART** as follows:

- Defendants are granted summary judgment on Crockett's claims based on his termination and other discrete acts of racial discrimination brought pursuant to Title VII, Section 1981, and the ELCRA;

- Defendants are granted summary judgment on Crockett's retaliation claims brought pursuant to Title VII, Section 1981, and the ELCRA;

- CBRE is granted summary judgment on Crockett's hostile-work-environment claim brought pursuant to Title VII; and

- The Motions are denied in all other respects.

---

463 (6th Cir. 1998).  Crockett did not name CBRE in the Charge of Discrimination he filed with the United States Equal Employment Opportunity Commission. Crockett has therefore not exhausted his administrative remedies as to CBRE. Crockett's ELCRA and Section 1981 hostile-work-environment claims do not have such an exhaustion requirement and Crockett can continue to pursue those claims against CBRE at trial.  *See, e.g.*, *Williams*, 643 F.3d at 511 n.3 (Section 1981 "does not require the exhaustion of administrative remedies"); *Rogers v. Bd. of Educ. of the Buena Vista Sch.*, 2 F.3d 163, 168 (6th Cir.1993) ("[P]laintiffs need not exhaust their administrative remedies under the [ELCRA] before bringing suit for unlawful discrimination").

Therefore, the only claims remaining for trial are Crockett's hostile-work-environment claims against Ford brought pursuant to Title VII, Section 1981, and the ELCRA and Crockett's hostile-work-environment claims against CBRE brought pursuant to Section 1981 and the ELCRA.

**IT IS SO ORDERED**.

s/Matthew F. Leitman
MATTHEW F. LEITMAN
UNITED STATES DISTRICT JUDGE

Dated:  October 5, 2015

I hereby certify that a copy of the foregoing document was served upon the parties and/or counsel of record on October 5, 2015, by electronic means and/or ordinary mail.

s/Holly A. Monda
Case Manager
(313) 234-5113